125 N.J. Super. 386 (1973)
311 A.2d 192
PAUL CASHEN AND IRENE CASHEN, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
FRANK SPANN, ROBERT BICKLEY, CHARLES M. EGAN, JR., JOHN DUNNE, INDIVIDUALLY AND AS SERVANT, AGENT OR EMPLOYEE OF CHARLES EGAN, JR., "JOHN DOE," BEING A FICTITIOUS NAME OF THE "RELIABLE INFORMER," NEW JERSEY BELL TELEPHONE COMPANY, ANTHONY DE BIASI, THE COUNTY OF MORRIS AND THE BOROUGH OF WHARTON, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 9, 1973.
Supplemental material filed May 14, 1973.
June 4, 1973.
June 28, 1973.
Decided November 2, 1973.
*390 Before Judges FRITZ, LYNCH and TRAUTWEIN.
Mr. Joseph S. Accardi argued the cause for appellants (Messrs. Accardi & Koch, attorneys; Mr. Conrad N. Koch on the brief; Mr. Joseph S. Accardi on the supplemental brief).
Mr. William T. McElroy argued the cause for respondents Spann, Bickley, Egan, Dunne, DeBiasi and the County of Morris (Messrs. Hughes, McElroy, Connell, Foley & Geiser, attorneys; Mr. Edward B. Deutsch on the briefs).
Mr. Joseph A. Hoffman argued the cause for respondent New Jersey Bell Telephone Company.
*391 No one appeared in behalf of respondent "John Doe."
The opinion of the court was delivered by LYNCH, J.A.D.
On June 19, 1970 detectives of the Morris County Prosecutor's Office and police of the Borough of Wharton, armed with a search warrant and seeking evidence of bookmaking and lottery, broke into the home of plaintiffs. As we now know, the raid was a bizarre mistake. Plaintiffs, a relatively elderly retired couple, were completely innocent of any wrongdoing, and utterly without connection with gambling or other illegal activity of any kind.
By an amended complaint plaintiffs sued Prosecutor Egan, detectives Bickley, Spann, Dunne and DeBiasi, one "John Doe," being a fictitious name of a "reliable informer" (who allegedly gave information that plaintiff Paul Cashen was involved in gambling activities), the New Jersey Bell Telephone Company (Telephone Company), the County of Morris (county) and the Borough of Wharton (borough). The amended complaint against the county, defendant officials and Telephone Company, charged false arrest and imprisonment, libel and slander, invasion of privacy and assault and battery. It also charged that the Telephone Company, through its employees, negligently and wantonly supplied false information to the prosecutor's detectives with respect to telephone calls made to plaintiff Paul Cashen.[1]
The answers of defendant prosecutor, detectives and the county set up, among other things, the defenses of immunity and failure of plaintiffs to state a claim upon which relief may be granted. Those defendants moved for summary judgment in their favor under, as they stated, "the doctrine of judicial immunity and its application covering conduct in the realm of the public prosecutor." Defendant Telephone *392 Company also moved for summary judgment, claiming that it acted in the premises in compliance with subpoena and other lawful orders of the prosecutor and hence was cloaked with the same immunity as the prosecutor. The company also claimed that provisions of the Communications Act of 1934, § 605 as amended, 47 U.S.C. § 605 (1968), absolved it from liability. The trial court granted summary judgment in favor of all defendants. Plaintiffs appeal from said judgment except, as said above, no appeal has been taken from the summary judgment which had earlier been granted in favor of the borough.
Plaintiffs also claim that the error of the trial court in granting summary judgment to defendants subsumed the court's further error in refusing to compel defendants to disclose the identity of the so-called "reliable informer" referred to in the affidavit of defendant Bickley which was the basis upon which the search warrant was issued.
The basic reasoning of the trial judge in granting summary judgment in favor of defendant prosecutor and detectives was that since, in his view, there was no showing of malice on their part or that they acted for "personal reasons of their own or distinct from their required duty," they were immune from suit. Since the County of Morris was sued on the theory that such officials were its agents, the county was likewise absolved.
As to defendant Telephone Company, the court held there was no liability because it acted pursuant to subpoena and, under the decisions in United States v. Covello, 410 F.2d 536 (2 Cir.1969), and Nolan v. United States, 423 F.2d 1031 (10 Cir.1969), and 47 U.S.C.A. § 605, the company was not liable.
In ruling that plaintiffs were not entitled to disclosure of the identity of the "reliable informer," the trial court held that the policy considerations which dictate nondisclosure of such information in criminal cases, expounded in State *393 v. Burnett, 42 N.J. 377 (1963), and other cases, are likewise controlling in this civil case and preclude such disclosure.
The affidavit upon which the issuance of the search warrant was based was sworn to by defendant Bickley. It read, so far as here pertinent, as follows:
On Monday, June 15, 1970, Det. Spann checked with the N.J. Bell Telephone Company as to phone calls made from 335-6508 and 539-6548, and it was learned from the Telephone Company that numerous calls were made to the residence at 9 Crater Avenue in Wharton, N.J., telephone number 366-3115 and telephone number 328-5364, and also telephone number 743-1133 in Bloomfield, New Jersey. A further check with the N.J. Bell Telephone Company revealed that the telephone number 366-3115, is listed to one Paul Cashen, 9 Crater Avenue, Wharton, New Jersey; telephone number 328-5634 is listed to the U.S. Government, Picatinny Arsenal, Dover, N.J. Building 94 QAD and in control of Paul Cashen; and telephone number 743-1133 is listed to one, Lamont Curran, 29 Washingtion Road, Bloomfield, New Jersey. Inv. Bickley called a person at Picatinny Arsenal who has given reliable information relative to gambling activities there and was advised by this informant that one, Paul Cashen, employed at Picatinny Arsenal, was accepting horse bets and number bets from fellow employees at the Arsenal, and that at least twice a day would call from one or two pay phones in Building 94 to someone with these bets. He also stated that he would keep notations in a small black notebook which he kept constantly on his person to record said bets.
On Monday, June 15, 1970, a further inquiry was made with the Telephone Company, and it was learned from this that numerous phone calls were made from the Raymond Dragos residence to Paul Cashen, to Bloomfield and numerous phone calls from John Peragallo's residence to Paul Cashen, to Bloomfield.
Telephone number 335-6508 was listed to Mrs. Virginia Peragallo, wife of John Peragallo, otherwise identified in the affidavit as being engaged in taking horse and number bets. Telephone number 539-6548 was listed to Raymond Dragos, also identified in Bickley's affidavit as engaging in taking of such bets. Concededly the information contained in Bickley's affidavit was false in the following respects: (1) no phone calls were ever made to Cashen's home by Peragallo or Dragos; (2) telephone number 328-5634 at Building 94 QAD at Picatinny Arsenal was not in control *394 of Paul Cashen at the time involved. Cashen had worked at Picatinny Arsenal for 38 years but had retired on October 31, 1969 and had been at the Arsenal on only one day since then, in January 1970, as he drove through the Arsenal grounds to go fishing; (3) the information allegedly given to Bickley that (a) Cashen was accepting horse and number bets at Picatinny, and (b) a least twice a day called from one or two pay phones in Building 94 with the bets, was false; (4) the information allegedly given by a representative of the Telephone Company that numerous phone calls were made to Cashen from the residences of Dragos and Peragallo was also false.
Detective Spann testified on deposition that on June 15, 1970 he called the Morristown office of the Telephone Company and was told that calls were being made to Cashen's home from those of bookmakers Peragallo and Dragos. Spann further testified that he normally dealt with a Mrs. DiFiore at the Morristown office but that she was not working on June 15, 1970, and he did not know the identity of the telephone representative who gave him the information. On the other hand, Mrs. DiFiore testified on deposition that she worked at the Boonton office and not at Morristown, as Spann said. But she did testify that on June 15 and 16, 1970 she was called at the Boonton office and advised Spann that there was no information relative to the investigation for that day. She specifically said she never gave the prosecutor's office any information as to Cashen's telephone number. There was also testimony that calls from Dragos to Cashen would not be toll calls, and therefore there would be no record of them. And Peragallo's phone would not be serviced by either the Morristown or Boonton office but by the Dover office. In fact, Mrs. DiFiore testified she was never asked to give any information relative to the Peragallo phone.
Against this factual background we must determine the propriety of (a) the summary judgment in favor of defendants, and (b) the order denying plaintiff's request that the *395 identity of the "reliable informer" be disclosed by first resolving these issues: (I) Are defendant prosecutor and his detectives cloaked with immunity from suit? (a) If there is immunity, what is its nature, respectively as to each such defendants and what, if any, are its limitations as to each? (b) If there is immunity but it is not absolute, are there any genuine issues of material fact which preclude granting of summary judgment to defendants? R. 4:67-5. (II) Were the prosecutor and his detectives agents of the county in doing what they did? (III) What, if any, is the liability of the Telephone Company in the premises, and (IV) Should defendants, under the circumstances of this case, be compelled to disclose the identity of the so-called "reliable informer"?

I

IMMUNITY OF DEFENDANT OFFICIALS
It appears that the trial court applied the same standard of immunity as to all official defendants and the county, i.e., that they are not liable in the absence of any showing of "malice" or that they acted "for personal reasons of their own." In this uniformity of treatment the court erred.
Defendant prosecutor was cloaked with the same immunity as possessed by a judge. A judge is not civilly liable for acts done which are at least colorably within his jurisdiction. Grove v. Van Duyn, 44 N.J.L. 654 (E. & A. 1882). Such judicial immunity has been recognized for centuries. Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872). That case explained the reason for the existence of such immunity as follows:
For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. Liability to answer to everyone who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of *396 this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. As observed by a distinguished English judge, it would establish the weakness of judicial authority in a degrading responsibility. Taaffe v. Downes, 3 Moore, P.C., 41, n. [at 347].
So it has been held that a prosecutor was immune to suit for false imprisonment alleged to have resulted from an arrest of plaintiff pursuant to a writ which the prosecutor delivered to a constable for execution. Hann v. Lloyd, 50 N.J.L. 1 (Sup. Ct. 1887). There it was said the prosecutor "acted within his official province in instructing the officer as to his official duty with respect to it." Id. at 5. See also, Edelman v. Dunn, 8 N.J. Misc. 154 (Sup. Ct. 1930). The reasons why a prosecutor is clothed with "judicial immunity" were well stated in Bauers v. Heisel, 361 F.2d 581 (3 Cir.1966):
In deciding the question of whether a prosecuting attorney is liable for acts done in his official capacity, we must decide whether his duties are sufficiently judicial as to cloak him with the same immunity afforded judges or are so closely related to those duties of law enforcement officials as to amerce him with potential civil liability for his imprudent actions. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Comment, 18 Ark. L. Rev. 81, 84-92 (1964). Analogy could support either conclusion, but we believe that both reason and precedent require that a prosecuting attorney should be granted the same immunity as is afforded members of the judiciary. The reasons are clear: his primary responsibility is essentially judicial  the prosecution of the guilty and the protection of the innocent, Griffin v. United States, 295 F. 437, 439-440 (C.A. 3, 1924); his office is vested with a vast quantum of discretion which is necessary for the vindication of the public interest. In this respect, it is imperative that he enjoy the same freedom and independence of action as that which is accorded members of the bench.[9] This reasoning is nearly as well established in Anglo-American law as judicial immunity itself. Yaselli v. Goff, 12 F.2d 396 (C.A. 2, 1926), aff'd, per curiam "on the authority of Bradley v. Fisher * * * [and] Alzua v. Johnson, 231 U.S. 106, 111, 34 S.Ct. 27, 58 L.Ed. 142," 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), and numerous cases and authorities cited therein. Prosecuting attorneys who have been sued under the Civil Rights Act, R.S. § 1979, have likewise been held immune. Laughlin v. Roseman, 82 U.S. App. D.C. 164, 163 F.2d 838 (1947); Kenney v. Fox, supra [232 F.2d 288 (C.A. 6)], and other cases cited in note 7, supra. [at 589] *397 And see extensive collection of cases in Bauers, n. 7 at 586, wherein prosecuting attorneys were held immune. See also Bethea v. Reid, 445 F.2d 1163 (3 Cir.1971), cert. den. 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972).
In State v. Winne, 12 N.J. 152 (1953), Chief Justice Vanderbilt stated that in some jurisdictions a county prosecutor is not subject to a civil suit for damages at the hands of an aggrieved citizen, but he observed: "* * * though that point has not been passed on here * * *." Id. at 170. The Chief Justice apparently meant that the question had not been passed on by the Supreme Court created by the 1947 Constitution, for he made no mention of Hann v. Lloyd, supra, or Edelman v. Dunn, supra, opinions of the former Supreme Court. However, in the same opinion he stated that the "kind of discretion required of the county prosecutor is not different from that required of a judge * * *." Id. at 174.
In the later case of Earl v. Winne, 14 N.J. 119 (1953), both Hann v. Lloyd and Edelman v. Dunn were mentioned in the following context:
The general rule is that an action will not lie against a judicial officer for an error in judgment, however, prejudicial to the rights of a party such error may be. Taylor v. Doremus, 16 N.J.L. 473 (Sup. Ct. 1838); O'Regan v. Schermerhorn, supra [25 N.J. Misc. 1] So it has been held in Nann [sic] v. Lloyd, 50 N.J.L. 1 (Sup. Ct. 1887), that a prosecutor of the pleas had the same immunity as a sheriff and his officers in executing process that on its face appeared to have been regularly issued by a court having jurisdiction of the subject matter. Again in Edelman v. Dunn, supra, it was held that an assistant prosecutor could not be liable for an error in judgment made in the course of his duty in relation to an arraignment and fixing of bail. [at 132]
Earl v. Winne, supra, laid down the following outline of a prosecutor's immunity:
The prosecutor of the pleas and his assistants are charged with the obligation to act in due accordance with the law in the discharge of their public duties, particularly by initiating such a proceeding by filing a complaint in a proper manner as established by *398 the prevailing practice. The mere fact that their private rights have been invaded permits no deviation based upon personal predilection or gain. They have the benefit of the presumption that they act legally in the discharge of their public duty, but if the presumption is overcome by convincing proof that they acted in excess of and distinct from their required official duty for personal reasons of their own, then for such acts they are civilly liable. It is only such acts which are redressable in actions for malicious prosecution and malicious abuse of process. [at 134]
The trial court herein applied that rule to defendant prosecutor and, finding that there was no evidence that he acted for "personal reasons" of his own, entered summary judgment in his favor. We agree and affirm as to that defendant. In doing so we are not unmindful of the decision in DeGroot v. Muccio, 115 N.J. Super. 15 (Law Div. 1971). We are not here called upon to approve, or disapprove, the result, or the opinion, in that case. The acts charged against defendant prosecutor here in no sense approach the "ultimate peak of wickedness" or the "horrendous" charges there made. We do note that in DeGroot, Hann v. Lloyd, supra, was not cited. Suffice it to say that the actions of the prosecutor here  insofar as he "acted" at all, since there was no proof of his personal participation or motivation herein  were clearly within his jurisdiction and no excess thereof is suggested. Therefore his "judicial" immunity is preserved. See Restatement, Torts, § 656 (1938); 1 Harper and James, The Law of Torts, § 4.3 (1956).
So far as appears, defendant DiBiasi merely executed the warrant of the court. Appellants point to no evidence that he acted with personal motives of his own; that he did not act in necessary compliance with a warrant issued by a court of competent jurisdiction and in good faith reliance thereon, or that he was in fact guilty of any charges in the complaint. A governmental agent cannot be made responsible in a judicial tribunal for obeying the lawful command of the government, and a public agent who acts pursuant to the command of a legal precept can justify his act by the production of that precept. Den ex dem. Murray *399 v. Hoboken Land and Imp. Co., 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1856). The language in Hann v. Lloyd, supra, is appropriate:
The result, therefore, is that we have a writ, duly authenticated, coming from a court of general jurisdiction, that was vested with cognizance over the class of cases to which it appertained, placed in the hands of the proper officials for execution. It is the legal rule that under such conditions the judicial precept must be implicitly obeyed by those to whom it is thus directed. This is a principle essential to the orderly administration of the law. And the consequence is that the officers to whom the writ is addressed will not be responsible for anything necessarily or properly done in its execution. Such ministers of the law need not show the grounds on which the tribunal in issuing the process proceeded, for they can rely on the writ alone without the production of the judgment record on which it is presumed to rest. It is not necessary to refer to books in support of a doctrine that no one will controvert. Plainly, the judge was right in holding that the writ was a complete vindication of the conduct of these ministerial officers for their arrest and detention of the plaintiff. [50 N.J.L. at 4]
Additionally, there is no evidence that DiBiasi acted in excess of his authority under the warrant. There thus being no demonstration of a genuine issue of material fact, we affirm the summary judgment in his favor.
However, unlike DiBiasi, defendants Bickley, Spann and Dunne did not act merely in obedience to the warrant issued by the court. The alleged actions of those defendants which are brought into question occurred before the warrant issued. Bickley made the affidavit which contained the false information. Allegedly, Spann gave false information which was contained in the affidavit and which he said he obtained from the Telephone Company. And, according to Bickley, Dunne participated in the drafting of the affidavit.
Bickley, Spann and Dunne acted essentially as police officers. The common law never granted police officers an absolute or unqualified immunity. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). See also Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 456 F.2d 1339, 1346 (2 Cir.1972) (on remand from *400 the United States Supreme Court 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)). In Bivens Judge Medina stated the reasons why immunity should not be extended to federal officers:
Thus, the real question to be asked is whether or not federal officers performing police duties warrant the protection of the immunity defense. We hold that they do not.
This policy decision has been expressed by courts in terms of "discretion"  making an arrest is not deemed to be a discretionary function. See e.g., Carter v. Carlson, 144 U.S. App. D.C. 388, 447 F.2d 358 (1971), cert. granted sub nom. District of Columbia v. Carter, 404 U.S. 1014, 92 S.Ct. 683, 30 L.Ed.2d 661 (Jan. 10, 1972); Sherbutte v. Marine City, 374 Mich. 48, 130 N.W.2d 920 (1964); Jaffe, Suits against Governments and Officers: Damage Actions, 77 Harv. L. Rev. 209, 218-19 (1963). "The tendency to hold a public official accountable appears to increase as the discretionary scope of his duties decrease. Hence, police officials, whose job is to enforce the law, are not given immunity." Note, Immunity of Prosecuting Officials from Suit for Alleged Deprivation of Civil Rights, 40 Temp. L.Q. 244, 250 (1967). Mr. Justice Harlan used similar reasoning in Barr [Barr v. Matteo], where he said that "the broader the range of responsibilities and duties, * * * the wider the scope of discretion * * *." 360 U.S. [564] at 573, 79 S.Ct. [1335] at 1340 [3 L.Ed.2d 1434]. Whereas it is true that a police officer must exercise some discretion in making an arrest, the fiction that this act is not discretionary is maintained because of the belief that the benefit to society derived from the protection of personal liberties outweighs the detriment of perhaps deterring vigorous police action. See Developments in the Law  Remedies Against the United States and its Officials, 70 Harv. L. Rev. 827, 835 (1957). Consequently, "[t]he common law has never granted police officers an absolute and unqualified immunity * * *." Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). See also K. Davis, Administrative Law Treatise § 26.03 at 874-5 (Supp. 1970).
In Jones v. Perrigan, 459 F.2d 81 (6 Cir.1972), plaintiff was arrested by Perrigan, an F.B.I. agent, pursuant to arrest warrants allegedly procured by Perrigan by execution of perjured affidavits in support thereof. Jones sued Perrigan for false imprisonment and malicious prosecution. The District Court dismissed the complaint, holding that Perrigan, as a public officer, was immune from liability. The Court *401 of Appeals, by a divided court, reversed, citing Bivens and said on its own behalf:
We disagree with the basis of the decision of the District Court. As a matter of public policy, certain officials are absolutely immune from liability for acts commited within the scope of their office, even if the acts were corrupt or malicious. [Citing cases]. The immunity of law enforcement officers from false arrest liability is a qualified one, in the nature of an affirmative defense. Immunity is available only if the officer acted in good faith with probable cause. [Citing cases]. "This immunity of officers cannot fairly be enlarged without jeopardizing the privacy or security of the citizen." [Citing cases]. The mere fact that Perrigan was an FBI agent does not per se establish his immunity from the claim of Jones. Fine v. Paramount Pictures, Inc., 171 F.2d 571, 574 (7th Cir.1948). [at 83]
New Jersey has adopted the ministerial-discretionary dichotomy as a means of limiting the potential liability of governmental officials acting within the scope of their authority. Where the officials act in a ministerial fashion, immunity will not be available. Kisielewski v. State of New Jersey, 68 N.J. Super. 258 (App. Div.), certif. den. 36 N.J. 144 (1961); Czyzewski v. Schwartz, 110 N.J. Super. 255 (App. Div. 1970). See also, Bedrock Foundations, Inc. v. Geo. H. Brewster & Sons, Inc., 31 N.J. 124 (1959). Where, however, the official acts in a discretionary fashion, immunity will be present unless ill will or bad faith be shown. In Bivens Judge Medina, in examining the case before him in light of the "discretionary" standard, said:
It would be a sorry state of affairs if an officer had the "discretion" to enter a dwelling at 6:30 A.M. without a warrant or probable cause, and make an arrest by employing unreasonable force. [456 F.2d at 1346].
While in the case before us the officers did obtain a warrant, it would be an equally "sorry state of affairs" to hold that officers had the "discretion" to obtain that warrant, as plaintiffs allege, upon a false affidavit or by supplying false information which was used in it. In any event, even if Bickley's, Spann's or Dunne's actions are deemed "discretionary," *402 there is still left the issue as to whether they acted from ill will, bad faith or malice.
Clearly, if plaintiffs' allegations are true, they have a cause of action for violation of their rights guaranteed to them under the Fourth Amendment of the United States Constitution. Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). We agree with the philosophy expressed in Cohen v. Norris, 300 F.2d 24 (9 Cir., en banc, 1962), that it would be ludicrous for plaintiffs to have an actionable claim for an unconstitutional violation of their rights and for police officers to be immune from suit for having committed the violation.
As has been seen, Bickley's affidavit was concededly false. In Earl v. Winne, supra, it was said:
But where the affiant falsely and maliciously states facts untruly and procures a warrant to be issued he becomes responsible for the prosecution and arrest, because if he had not made the false affidavit and asked for the issuing of the warrant, the court could not and would not have decided that criminal process should issue. Malice and want of probable cause are thus inferred from the falsity of the affidavit upon which the arrest was procured. Navarino v. Dudrap, 66 N.J.L. 620 (E. & A. 1901). [14 N.J. at 133; emphasis added][2]
So too, the false information which Spann allegedly gave to Bickley and which he said had been obtained from the Telephone Company raises genuine issues of material fact as to whether he acted in good faith or maliciously. However, by posing these issues we are not to be understood as suggesting that either Bickley, Spann or Dunne in fact acted other than in good faith. We hold only that there are genuine issues of material fact which preclude entry of summary judgment in their favor. R. 4:67-5. And this *403 is especially so where the issues remaining relate to "subjective" elements such as good faith and malice. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 76 (1954). As also said there as to granting summary judgment: "Indeed, subjective elements aside, a note of caution has been sounded as to any case where the opposing party must prove his claim * * * from what he can draw from the other party." That is plaintiffs' task here. Summary judgment in favor of defendants Bickley, Spann and Dunne is reversed and a plenary trial is ordered as to them. We repeat for the sake of emphasis, however, that we are not passing on the question as to whether, at such trial, the proofs will establish the traditional elements of the several causes of action alleged by plaintiffs or whether valid defenses will be established on defendants' part.

II

AS TO THE COUNTY OF MORRIS
The theory upon which plaintiffs assert liability on the part of the County of Morris is that the prosecutor and his aides were acting in this instance as agents of the county which was therefore vicariously liable on principles of respondeat superior. The short answer  though the question was not discussed in any of the briefs  is that the prosecutor and his aides were not agents of the county, but rather of the State in their actions with respect to plaintiffs. See Atty. Gen. P.M. 1955, No. 27. The county prosecutor is a constitutional officer appointed by the Governor, with the advice and consent of the Senate. N.J. Const. (1947), Art. VII, § 2, ¶ 1. The relevant statute provides that: "The criminal business of the State shall be prosecuted by the Attorney General and the county prosecutors." N.J.S.A. 2A:158-4 (emphasis added). The county prosecutor represents the State. State v. Longo, 136 N.J.L. 589 (E. & A. 1947). And ultimately when an indictment is found, the prosecution thereof is undertaken by *404 the State of New Jersey in its own name. Therefore, in performing the actions with which they are charged, the prosecutor and his aides were the agents of the State and not of the County of Morris, and there is no liability as to the county for those actions under the doctrine of respondeat superior. Thus we do not reach the question of any immunity which the county may have had at the time of the action sued upon. We also leave for an appropriate case the question of whether the county may be vicariously liable for the actions of detectives in other circumstances.
The summary judgment in favor of the County of Morris is affirmed.

III

AS TO THE TELEPHONE COMPANY
The amended complaint alleges that the Telephone Company "wrongfully, negligently and unlawfully told the defendant Frank Spann that calls were being made from the telephone which were [sic] allegedly being used for the commission of crime to the telephone of the plaintiffs. The New Jersey Bell Telephone Company know [sic] or should have known that this information was false." The complaint further alleged that the said false information was "negligently, recklessly, maliciously and wantonly supplied by the defendant New Jersey Bell Telephone Company to the defendant Frank Spann * * *." In essence, it is a charge of a malicious slander on the part of the company through its "representative."
It is the Telephone Company's contention that, since any information supplied to detective Spann was given subject to subpoena, it is cloaked with the same immunity as possessed by the prosecutor. It further argues that it is immune to suit by reason of section 605 of the Federal Communications Act of 1934, 47 U.S.C.A. § 605. We consider these contentions in inverse order.
*405 The latter argument is stated in the company's brief as follows: "It has been established that the making of toll records by telephone equipment used in the ordinary course of company business does not constitute an unlawful interception and their divulgence to appropriate law enforcement authorities upon subpoena is both legal and proper." In support thereof the company cites United States v. Covello, supra, 410 F.2d 536 (2 Cir.1969), and Nolan v. United States, supra, 423 F.2d 1031 (10 Cir.1969). Covello and Nolan, so far as relevant at all, stand only for the proposition that toll records are admissible in a criminal trial, and their divulgence therein to law enforcement authorities is not an impermissible interception under section 605 of the Federal Communications Act. It does not follow from the correct argument of the company that it was "proper" to make toll records and not impermissible to divulge the information to the prosecutor's detectives, that the company is absolved by statute from all liability.
There is no authority for the proposition that the Telephone Company is cloaked with the same immunity as the prosecutor merely because it acted pursuant to subpoena. Parenthetically, we note Spann testified that his information that the Cashens' telephone was being used for gambling activity came from a telephone conversation with a representative of the company. It is not claimed that the information came from any records produced pursuant to subpoena. However, we do hold that the Telephone Company was cloaked with a qualified privilege with respect to whatever communications its "representative" may have given a law enforcement officer such as Spann. A communication, made bona fide, on any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged; and if made to a person having a corresponding interest or duty, though the communication would be actionable if it were not for the privilege. Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375 (1959); Jorgensen v. Pennsylvania *406 R.R. Co., 25 N.J. 541, 543 (1958); King v. Patterson, 49 N.J.L. 417, 430 (E. & A. 1887). The purpose of establishing such privilege is for the welfare of society and "* * * it is `in the public interest that persons should be allowed to speak freely on occasions when it is their duty to speak, and to tell all they know or believe, or on occasions when it is necessary to speak in protection of some [self or] common interest': * * *." Coleman v. Newark Morning Ledger Co., supra, at 377 of 29 N.J. It is indeed in the public interest that a telephone company supplying information to prosecuting authorities in the aid and detection of crime should have such a privilege.
A qualified privilege may be overcome only if there is a showing of express or, as it is sometimes called, actual malice. Coleman, supra, at 374-375. Such malice is to be distinguished from that implied malice which may be inferred from the falsity of Bickley's affidavit (if it was false), as pointed out in Earl v. Winne, supra, 14 N.J. at 133 (see Point I above). No such inference of express or actual malice can be drawn from the mere fact that the libelous or slanderous words were false. Odgers, The Digest of the Law of Libel and Slander (6th ed. 1929), 293. As said in Gately on Libel and Slander (5th ed. 1960), 567:
Privileged occasion. Where the words were published on a privileged occasion, the mere proof that they are false is not evidence of malice. "Even though the statement should be untrue in fact, the defendant will be held justified by the occasion unless it can be shown to have proceeded from a malicious mind." "Mere falsehood is certainly no disproof of bona fides."
Express malice, with which we are now concerned, means something more than the "fictitious legal malice" (Coleman, supra, at 375 of 29 N.J.), which is implied from an unprivileged defamation. It must encompass a purpose to make the publication, not primarily for the purpose for which the privilege is bestowed, but for some wrongful motive such as ill will or to accomplish an objective not within the purpose *407 of the privilege. Id. And, when the occasion is privileged, as we hold here, the onus lies on plaintiffs to prove defendant's malice, for the bona fides of the defendant is always presumed. Odgers, op. cit., at 284, and Coleman at 373. On such privileged occasion, in what may be termed obeisance to the privilege, it will be assumed that defendant published the defamatory matter honestly believing it to be true, unless there is some evidence from which a contrary inference may be drawn. Gately, op. cit., §§ 480, 481, at 271-272. It is plaintiffs' burden to produce such evidence. If indeed the evidence is merely equivocal, i.e., equally consistent with malice or bona fides, or if the evidence is a mere scintilla, the judge should stop the case. Odgers, op. cit., at 284-285. As the latter authority puts it:
"If once the privilege be established, unless there be extrinsic evidence of malice, there must be something so extreme in the words used as to rebut the presumption of innocence, and to afford evidence that there was a wrong and an indirect motive prompting the publication" (per Buckmaster, L.C., in Lyal v. Henderson, [1916] S.C. (H.L.), at p. 175). [at 293]
Assuming that the "representative" of the Telephone Company gave Spann the information which he ascribes to her, we conclude that there is no evidence of express or actual malice on the part of the company or its "representative." For these reasons the summary judgment in favor of the Telephone Company is affirmed.

IV

DISCLOSURE OF THE IDENTITY OF THE INFORMER
Plaintiffs appeal from the action of the trial court in refusing to compel defendant officials to disclose the identity of the so-called reliable informer referred to in Bickley's affidavit. Defendant officials rely on the "informer's privilege" (Evidence Rule 36; N.J.S. 2A:84A-28), and the *408 philosophy denying disclosure of the informer's identity as expressed in numerous criminal cases. In doing so they cite, among others, State v. Burnett, 42 N.J. 377 (1964), and State v. Petillo, 61 N.J. 165 (1972), cert. den. 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973).
The privilege relied upon is not the privilege of the informer but the privilege of the Government. The scope of the privilege is limited by its underlying purpose. That purpose is the furtherance and protection of the public interest in effective law enforcement. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). As said in the latter case (at 59, 77 S.Ct. at 627), "The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." And, "A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." (Emphasis added). The same limitation as to "fairness" on the privilege is incorporated in Evidence Rule 36, N.J.S.A. 2A:84A-28.
No absolute rule can be laid down as to when disclosure of the informer's identity is essential to a fair determination of the issues. What is called for is a balancing of the public interest in protecting the flow of information and the legitimate interests of the informer against the rights of others to a fair determination. Roviaro, as adopted in State v. Burnett, supra.
Weighing the issue of disclosure here by the foregoing tests, we conclude that no valid public purpose can be served by withholding disclosure of the identity of the informer upon which Bickley relied in his affidavit. The information, if given at all, was totally false. Therefore the so-called informer cannot be said to be reliable. No public *409 benefit would be served by continuing his "informer" services. If he were to follow the pattern established in this case, he would only mislead the authorities and defeat the public interest. Assuming that he exists and that he did in fact relate to Spann the information charged to him, his disservice to law enforcement, whether it be by carelessness, by incompetence, or by intention, is abundantly apparent.
As we have said above, since the affidavit of Bickley contains false information, malice may be inferred therefrom. Such inference may be rebutted on Bickley's part by revelation of the reasons why he relied upon the informer. If indeed the informer cannot be identified, then malice on the part of Bickley could readily be found by the jury.
In Brogan v. The Passaic Daily News, 22 N.J. 139 (1956), a libel suit wherein defendants pleaded the newspaperman's statutory privilege (then N.J.S. 2A:81-10) and refused to disclose the "reliable source" they had relied on, the Supreme Court said:
The position of the respondents in this case is that they insist on asserting these defenses based upon the reliability of the source of information upon which they relied, yet refuse to disclose what those sources were, so that the jury could ascertain whether they were in fact reliable. [at 152]
And,
When the trial court upheld the claim of privilege by the witness Smith with respect to questions as to the identity of the "reliable source" of his information, he foreclosed the plaintiff of obtaining information favorable to its position to combat the defenses of good faith and fair comment and lack of malice raised by the defendants. The cross-examination of a party witness on matters directly in issue and directly relevant to the issue is a matter of right. [at 153]
It was held that the privilege had been waived. See also Beecroft v. Point Pleasant Print & Pub. Co., 82 N.J. Super. 269 (Law Div. 1964).
So here, defendant Bickley asserts that he had a "reliable informer" and he will undoubtedly defend on the ground that *410 he had probable cause to make the affidavit and acted in good faith. But by refusing to disclose the identity of the informer he would unfairly deny plaintiffs the right to test those defenses and would preclude them from cross-examining him "on matters directly in issue" which is a "matter of right." To do so is violative of the object of Evidence Rule 36 which would compel disclosure "to assure a fair determination of the issues."
It is important that we note emphatically that not every misstatement or inaccuracy by an informer will necessarily result in the scales balancing toward a divulging of his identity. As with many situations where important public considerations are involved, in the sensitive and delicate area of a balancing of public and individual rights, determination should be made on the basis of the facts in the particular area. In each case, "We must assay the fairness of nondisclosure in the context in which it arises * * *" (Burnett, supra, 42 N.J. at 386), both legally and factually.
Defendant officials further support their contentions on this subject by arguing that the attempt of plaintiffs to discover the identity of the informer is essentially an attack upon the truthfulness of Bickley's affidavit, and such an attack is precluded by the opinion in State v. Petillo, supra. True, where the issue is whether an affidavit submitted in support of an application for a search warrant supplies sufficient probable cause for the issuance of that warrant, an attack upon the truthfulness asserted in the affidavit is precluded by Petillo. As Justice Francis said in that case:
The standard provided in the Constitutions as the basis for intrusion into the home of a citizen because of alleged gambling activities is not proof of his guilt of the criminal offense. The requirement is sworn statements of fact of sufficient legal quality to persuade an impartial judge that probable cause exists to believe that the crime described is being committed at the place. Once that test is ment to the satisfaction of the judge, relitigation of the truth of the factual basis for issuance of the warrant should not be permitted. [61 N.J. at 174]
*411 But most pertinent to the issue in this civil case where defendant Bickley is charged with making a false affidavit, Justice Francis expressly excluded application of his decision to a case such as this when he said: "Further, so far as the untruthful officers are concerned, they expose themselves to the sanctions of indictment for perjury or false swearing, a charge of criminal contempt, and assessment of monetary damages in a civil action." Id. at 174; emphasis added. And again he expressly said, after laying down the rule as to testing the veracity of an affidavit if it be sufficient on its face for the issuance of a warrant: "We think such a rule adequately serves the purpose of the Fourth Amendment, and that sufficient deterrence to the rare false affidavit that may slip by the issuing judge is provided by the sanctions of perjury, contempt and civil damages." Id. at 178-179; emphasis added.
There is no issue as to the validity of the search warrant here. Attack on the falsity of the affidavit of Bickley is therefore not precluded and plaintiffs are entitled to a trial on the remedy they seek here, i.e., recovery of civil damages.
We therefore reverse the order of the trial court in denying disclosure of the identity of the informer referred to in Bickley's affidavit to the end that plaintiffs may be assured a fair determination of the issues, including that as to the falsity of the affidavit, the motivation therefor, and the good faith or malice of the maker.

CONCLUSION
In summary, the summary judgment granted in favor of defendants Prosecutor Egan, DeBiasi, County of Morris, and the Telephone Company, is affirmed. The summary judgment granted in favor of defendants Bickley, Spann and Dunne, is reversed. The order denying plaintiffs information as to the identity of the informer referred to in Bickley's affidavit is reversed and such disclosure is to be made.
No costs to any party.
NOTES
[1] Since no appeal has been taken against the borough, we need not recount the charges against it.
[2] The "malice" here spoken of is implied malice as distinguished from the express malice which a plaintiff in a libel or slander suit must establish to overcome a qualified privilege. See Point III, infra.